

NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 CU 0056

WENDY MARIE MARTINEZ COUVILLON

VERSUS

MICHAEL ANDRE COUVILLON

Judgment Rendered: **AUG 2 9 2023**

* * * * *

On Appeal from the
Thirty-Second Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
No. 184,582 Division "C"

The Honorable Juan W. Pickett, Judge Presiding

* * * * *

| | |
|---|---|
| Kentley R. Fairchild<br>Houma, Louisiana | Attorney for Appellant<br>Wendy Marie Martinez Couvillon |
| Laura Randall<br>Heather C. McAllister<br>Houma, Louisiana | Attorneys for Appellee<br>Michael Andre Couvillon |

* * * * *

**BEFORE: McCLENDON, HOLDRIDGE, AND GREENE, JJ.**

GREENE, J. concurs with reasons.

McClendon, J. Agrees in Part and Dissents in part with Reasas,

**HOLDRIDGE, J.**

This is an appeal of a custody judgment granting the father's contempt motion, thereby finding the mother in contempt of court and awarding the father twelve weeks of makeup time of physical custody, and denying the mother's reconventional demand seeking to be designated as the domiciliary parent and to modify the consent custody judgment to reduce the father's physical custody. We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

Wendy Marie Martinez Couvillon and Michael Andre Couvillon married on August 28, 1999. Two children were born of the marriage, L.C. on February 22, 2005, and S.C. on October 26, 2006. On December 3, 2018, Ms. Couvillon filed a petition for divorce, wherein, among other items, she sought joint custody and to be designated as the domiciliary parent. In accordance with a detailed proposed joint custody implementation plan attached to the petition, she sought physical custody of the children at all times with Mr. Couvillon having reasonable visitation. On January 22, 2019, Mr. Couvillon answered the petition and filed a reconventional demand wherein he sought joint custody and to be designated as the domiciliary parent, among other items.

On February 3, 2020, the trial court signed a judgment of divorce. On July 28, 2020, Mr. Couvillon amended his reconventional demand to allege that since the parties separated, Ms. Couvillon had denied him reasonable access to the children, including refusing to allow him overnight visitation.

The trial court held a custody and visitation hearing on September 16, 2020. Following the testimony of Ms. Couvillon and Mr. Couvillon and **Watermeier** hearings with the children, Ms. Couvillon's counsel informed the trial court that a

consent agreement as to custody had been reached.[1]  The trial court then made

statements about the case, followed by the trial court and counsel dictating the terms

of the consent agreement into the record.  On December 4, 2020, the trial court

signed a "CONSENT JUDGMENT" wherein the parties were awarded joint legal

and physical custody of the children.  The judgment provided that Mr. Couvillon

would have physical visitation and that the periods of physical custody would

gradually increase from several hours weekly to overnight visits.  Beginning on

February 8, 2021, the parties were to share physical custody of the children "on a 7

and 7 rotating basis."  The consent judgment provided that the parties and children

"shall adhere" to the joint custody implementation plan made a part of the judgment

by reference.

Mr. Couvillon filed a rule for contempt on April 5, 2022, wherein he alleged

that Ms. Couvillon failed to allow or enforce visitation between him and the children

as required by the consent judgment and the joint custody implementation plan.  Mr.

Couvillon specifically referred to Monday, March 15, 2022, when the children drove

to his house for their scheduled weekly custody.  According to Mr. Couvillon, upon

arrival at his residence, S.C. began arguing with him and "demanded to go back to"

Ms. Couvillon's house.  Mr. Couvillon alleged that the children left in a vehicle

provided by Ms. Couvillon's boyfriend and returned to Ms. Couvillon's house.  He

also alleged that on Saturday, March 26, 2022, Ms. Couvillon informed him that she

was not sending the children for their weekly custody with him because they did not

want to go.  He sought to have Ms. Couvillon held in contempt of court; punished in

---

[1] A **Watermeier** hearing is a closed hearing, outside the presence of the parents, but in the presence of their attorneys, with a record of the hearing to be made by the court reporter, to inquire as to the competency of a child to testify as to custody.  See **In re D.C.M.**, 2013-0085 (La. App. 1 Cir. 6/11/13), 170 So.3d 165, 168 n.9, writ denied, 2013-1669 (La. 7/17/13), 118 So.3d 1102, citing **Watermeier v. Watermeier**, 462 So.2d 1272 (La. App. 5 Cir.), writ denied, 464 So.2d 301 (La. 1985).

3

accordance with La. R.S. 13:4611, 9:346, and 9:375; ordered to pay court costs and attorney's fees; ordered to provide him with makeup visitation; and imprisoned and fined.

In her answer to the contempt rule and reconventional demand, Ms. Couvillon alleged that Mr. Couvillon had a poor relationship with the children and had made no meaningful attempt to work towards a good relationship. She alleged that, among other things, Mr. Couvillon was authoritative and did not actively participate in the children's school or extracurricular activities. Ms. Couvillon sought a modification of physical custody such that Mr. Couvillon would have physical custody of the children every other weekend, that she be designated as the domiciliary parent, that Mr. Couvillon be ordered to attend parenting classes or therapy with a licensed counselor, and that Mr. Couvillon and the children be ordered to attend reunification therapy.

The trial court held a hearing on the parties' motions on July 18, 2022, and July 29, 2022. The trial court spoke about the issues at the conclusion of the hearing and then took the matter under advisement. The trial court signed its judgment on August 15, 2022, and did not give reasons for judgment. As to Mr. Couvillon's contempt motion, the judgment states that the trial court granted the motion, finding Ms. Couvillon in contempt for willfully disobeying a prior court order by denying Mr. Couvillon custody during his custodial periods. The judgment states that Ms. Couvillon's punishment for being found guilty of contempt of court was the following: that Ms. Couvillon serve thirty days in parish jail, that Mr. Couvillon was granted sole custody of the children with Ms. Couvillon having visitation every other weekend, that Mr. Couvillon was granted twelve weeks of makeup time with the children, that Ms. Couvillon pay a $500 fine, and that Ms. Couvillon pay attorney's fees of $500 and all court costs associated with Mr. Couvillon's contempt rule on or

4

before October 31, 2022. The trial court's imposition of the fine and imprisonment and its award of sole custody were suspended on the condition that Ms. Couvillon abide by the shared physical custody in the joint custody implementation plan, that Ms. Couvillon pay the attorney's fees of $500 and court costs, and that Mr. Couvillon receive the twelve weeks of physical custody makeup time. As to Ms. Couvillon's reconventional demand, the trial court denied her requests to modify the custody order to every other weekend physical custody for Mr. Couvillon, to be named domiciliary parent, to be awarded court costs and attorney's fees, and to have Mr. Couvillon attend parenting classes or therapy with a licensed counselor. The trial court granted Ms. Couvillon's request that Mr. Couvillon and the children be required to attend reunification therapy, with the costs to be split equally between parties.

Ms. Couvillon appealed the adverse judgment. On appeal, Ms. Couvillon raises four assignments of error. In her first assignment of error, she contends that the trial court erred in failing to designate a domiciliary parent. In her second assignment of error, Ms. Couvillon contends that the trial court abused its discretion in failing to modify physical custody. In her third assignment of error, Ms. Couvillon contends that the trial court erred in finding her in contempt of court. In her fourth assignment of error, Ms. Couvillon contends that the trial court erred in awarding Mr. Couvillon twelve weeks of makeup time of physical custody as a punishment for the alleged contempt of court.

## DISCUSSION

The court shall award custody in accordance with the best interest of the child. La. C.C. art. 131. If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the best interest of the child requires a different award or the provisions of La. R.S. 9:364 in the Post-Separation

Family Violence Relief Act apply. See La. C.C. art. 132. Subject to the provisions of La. R.S. 9:364, in the absence of an agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent. See La. C.C. art. 132.

Each child custody case must be viewed in light of its own particular facts and circumstances, with the paramount consideration being the best interest of the child. See La. C.C. art. 131; **Moore v. Prater**, 2021-1430 (La. App. 1 Cir. 6/3/22), 342 So.3d 994, 998. The trial court is in the best position to ascertain the best interest of the child given the unique circumstances of the particular case; thus, the trial court's custody determination is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. **Moore**, 342 So.3d at 998.

Additionally, in most child custody cases, the trial court's determination is based heavily on factual findings. When presented with two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. **Stobart v. State through Department of Transportation and Development**, 617 So.2d 880, 883 (La. 1993). Furthermore, it is well-settled that where there is a conflict in testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact are not to be disturbed by a reviewing court. **Moore**, 342 So.3d at 1001. If documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible that a reasonable fact finder would not credit it, the reviewing court may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. But in the absence of such factors, where the finding is based on the trial court's decision to credit the testimony of one party over the other, the finding

6

can virtually never be manifestly erroneous or clearly wrong. **Rosell v. ESCO**, 549

So.2d 840, 844-45 (La. 1989). As the **Moore** court has observed:

> In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court, who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of the witnesses, and decide how much weight to give the testimony in light of the factors in [Article] 134.

**Moore**, 342 So.3d at 1002 (quoting **Fuller v. Fuller**, 54,098 (La. App. 2 Cir.

7/21/21), 324 So.3d 1103, 1114, writ denied, 2021-01223 (La. 9/27/21), 324 So.3d

621).

Louisiana Civil Code article 134(A) provides a non-exclusive list of factors

that the trial court shall consider, along with any other relevant factors, in

determining the best interest of the child.[2] The weight to be given each factor is left

---

[2] Louisiana Civil Code article 134(A) states:

> Except as provided in Paragraph B of this Article [cases involving a history of family violence or domestic abuse], the court shall consider all relevant factors in determining the best interest of the child, including:
>
> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.
>
> (2) The love, affection, and other emotional ties between each party and the child.
>
> (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
>
> (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
>
> (5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
>
> (6) The permanence, as a family unit, of the existing or proposed custodial home or homes.
>
> (7) The moral fitness of each party, insofar as it affects the welfare of the child.
>
> (8) The history of substance abuse, violence, or criminal activity of any party.

to the discretion of the trial court. **Moore**, 342 So.3d at 1000. In making its determination, the trial court is not bound to make a mechanical evaluation of or provide a literal articulation of all the statutory factors listed in Article 134, but should decide each case on its own facts in light of those factors. See **Moore**, 342 So.3d at 1000. Nor is the trial court required to specifically explain its weighing and balancing of the Article 134 factors. **Moore**, 342 So.3d at 1001. Rather, the trial court should decide each case on its own facts and circumstances in light of Article 134 and other relevant factors. **Moore**, 342 So.3d at 1001.

While the older child of the parties, L.C., was a minor at the time of the hearing and judgment in this matter, she has since attained the age of majority. See La. C.C. art. 29. It is well-settled that courts will not decide abstract, hypothetical, or moot controversies, or render advisory opinions with respect to controversies. **Guidry v. Guidry**, 2019-0534 (La. App. 1 Cir. 9/26/19), 2019 WL 7177093, *3 n.4 (unpublished opinion), writ denied, 2020-00141 (La. 2/26/20), 347 So.3d 878. Therefore, any issues concerning L.C.'s legal and physical custody are now moot, and the custody issues in this appeal affect only the remaining minor child, S.C.

---

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

8

At the hearings on the motions to modify custody and for contempt, Ms. Couvillon, Mr. Couvillon, the children, and Dr. Betsy St. Pierre Dupre, an expert witness as a licensed professional counselor, testified. Ms. Couvillon introduced one exhibit, copies of texts she sent to Mr. Couvillon. In her reconventional demand to modify custody, Ms. Couvillon alleged that the following items constituted material changes in circumstances: Mr. Couvillon's transfer of his naval reserve duty from Louisiana to San Diego, California, which interfered with his physical custody of the children; the severe deterioration of his relationship with the children since the consent judgment was signed; his returning the children early from his physical custody on occasion; his refusal to co-parent; his refusal to provide an atmosphere conducive for the children's studying; his failure to provide an atmosphere beneficial to S.C., who suffered from panic attacks, anxiety, depression, and self-mutilation; his failure to bring the children to school in the morning due to their failure to clean their rooms and making the children late for school and causing one child to have a panic attack; and the children's ages and preferences.

Mr. Couvillon testified that from the time he and Ms. Couvillon separated, the children did not want to visit or stay overnight with him, so the December 2020 consent judgment provided gradually increasing physical custody with him, culminating in February 2021, when he and Ms. Couvillon would each have physical custody of the children every other week. According to Mr. Couvillon, the physical custody mainly proceeded according to the schedule in the consent judgment until late February or early March of 2022, when the children returned to Ms. Couvillon's house on two occasions (one of which was a basis for his contempt rule). Mr. Couvillon, a nurse practitioner working at Terrebonne General Medical Center, stated that he was also in the United States Naval Reserve. His reserve duties required him to drill one weekend per month and to work another job in the intensive

9

care unit at Chabert Medical Center. He testified that at the time the consent judgment was entered into, he also had drill weekends. Until January 2022, the drill weekends were in Belle Chasse, and then they were in San Diego, California. According to Mr. Couvillon, the additional travel required to get to San Diego did not affect his visitation schedule. However, he also admitted to missing several of the children's extracurricular activities. Moreover, Ms. Couvillon testified that since his transfer to San Diego, the seven and seven weekly custody arrangement had not taken place.

Mr. Couvillon testified that he attended counseling with Dr. Dupre with the children, but he believed it was counterproductive and that his relationship with the children worsened. According to Mr. Couvillon, he later found a counselor of his choice for which he scheduled appointments for the children, but they refused to attend. Mr. Couvillon testified that he was aware of S.C.'s mental health issues, which included anxiety and depression, and that they were present before the consent judgment. However, he admitted that the diagnoses of self-harm, anxiety, panic attacks, and depression were made after the consent judgment. Mr. Couvillon stated that he had met with S.C.'s therapist about her issues and her progress. However, he also admitted that, while S.C. had been seeing Celeste Shelby, a therapist, before the consent judgment, she saw Dr. Mike Watkins and was put on Zoloft and Adderall after the judgment was signed. When questioned, Mr. Couvillon agreed that his style of parenting was authoritative.

Ms. Couvillon, a religion and certified biology teacher at Vandebilt Catholic High School, testified that the children had positive experiences with Dr. Dupre and that Mr. Couvillon never requested that a new counselor be found.[3] She indicated

---

[3] Ms. Couvillon testified that she found out that Mr. Couvillon wanted a new counselor when L.C. told her that Mr. Couvillon texted L.C. that he was picking L.C. and S.C. up the next morning at

that communication with Mr. Couvillon had been problematic.[4] She testified that she communicated with him about the children's extracurricular activities and their sicknesses or school absences by email or text, but she did not always get a response.

Ms. Couvillon testified as to the time that the children spent with Mr. Couvillon since January 2022, due to his second job and his time in San Diego.[5] Ms. Couvillon testified that at the prior court hearing, S.C. did not have a definite mental health diagnosis because her first visit with her counselor was two weeks before the hearing. Ms. Couvillon testified that she had talked to Dr. Dupre several times to discuss what she could to do to help with the children's relationship with Mr. Couvillon.[6] Ms. Couvillon testified that her biggest concern if the trial court continued the seven and seven schedule was S.C.'s mental health, "especially since they stopped seeing Dr. Dupre." Ms. Couvillon stated,

> When [S.C.] comes back [from custody with Mr. Couvillon], there's a lot of anxiety. There's a lot of heightened darkness with her. She gets to the point where some days, she's not eating. We have crying on Sundays. She's worried about going back. It's a progression that has not been healthy; and I worry about her self-harm ideation.

According to Ms. Couvillon, when they were previously seeing Mr. Couvillon on the weekends and during the week for dinner, the children "were speaking fondly about their relationship with their father."

---

first hour to take them to a new counselor. Ms. Couvillon said "okay," but because L.C. had a test, she could not go.

[4] Ms. Couvillon testified that Mr. Couvillon had taken the children to the hospital to be tested for COVID when they were sick, but he never told her they were tested or the test results.

[5] According to Ms. Couvillon, since Mr. Couvillon began going to San Diego in January 2022, he brought the children to school on Thursday morning and they went to her house on Thursday afternoon, staying through the following week. The children would be with Mr. Couvillon Monday after school through Thursday morning; after school on Thursday, they would stay with her for a week and then through Tuesday night and return to Mr. Couvillon on Wednesday after school. Then, she testified, they would be with him Wednesday through Monday, followed by a seven-day period with her, then a three-day period with him. She testified that she received an email that he had his annual training from August 6, 2022, through August 20, 2022.

[6] She testified that she purchased extra tickets for the children's extracurricular events so that Mr. Couvillon could attend.

11

Dr. Dupre testified that she saw the parents and the children separately and together for a total of six visits from November 2020 through December 2021 to help the children adjust to the seven and seven custody schedule they were transitioning to because they did not want that schedule and were having some mental health concerns. At the time of the first session in November 2020, she testified that S.C. was diagnosed with depression and celiac disease. Dr. Dupre testified that Mr. Couvillon had more of an authoritative parenting style and Ms. Couvillon had more a nurturing and sometimes permissive personality. Dr. Dupre said that in every session Ms. Couvillon reiterated that she wanted to encourage the children's relationship with Mr. Couvillon. Dr. Dupre testified that prior to the November 2021 session with the children and Mr. Couvillon, S.C. was taken off Adderall "because she had some suicidal ideations." Because S.C. was in separate individual counseling, Dr. Dupre did not discuss what led to the suicidal ideations. When asked if it would be detrimental to the children's long-term health if they were forced to do the seven and seven schedule, she answered,

> With [S.C.], it worries me. It does, because she can be extremely emotional. Again, I refrain from going into [S.C.'s] tendencies with her, because I'm not her independent counselor. But from the little she has told me, and I have spoken to Celeste Shelby, on one occasion, her counselor – she did call me. It worries me, her mentality, of being in a place that she doesn't want to be, and with an authoritative parenting style, and her emotional history, it concerns me that she might act out; yes.

When asked if the children were "mentally safe" with Mr. Couvillon, Dr. Dupre testified:

> With [S.C.'s] depression and anxiety, am I more concerned about her being impulsive and harming herself[?]; yes. Because when [S.C.] gets emotional, if [Mr. Couvillon] has a harsh response, then it cycles. So, then she becomes more emotional; and I have worked with [Mr. Couvillon] on being softer, on exploring the girls' feelings more. [L.C.] can adapt better to it. [S.C.] seemed to have more of a problem handling it.

12

And that would be my concern—emotionally, for the welfare of [S.C.], it's just that she is impulsive.

L.C. testified that she was a seventeen year-old high school student in the twelfth grade with a 3.9 grade point average, in honors classes, and involved in many extracurricular activities. S.C. testified she was fifteen years old, in tenth grade in high school in all honors classes with a 4.0 grade point average, and also involved in many extracurricular activities. L.C. and S.C. both testified that they felt comfortable with Dr. Dupre and felt they made progress with their relationship with Mr. Couvillon while seeing her. According to S.C., they stopped seeing Dr. Dupre around Thanksgiving, around the time her relationship with Mr. Couvillon deteriorated. She testified that she saw an individual counselor for self-harm concerns, anxiety, panic attacks, and depression, and she was on medications. When explaining what she thought of the environment at Mr. Couvillon's, S.C. testified:

> The environment, at his house, is one of anxiety, definitely. I noticed this. My sister has told me that she notices, most of all, that my mental health regresses. I lose progress. Whenever I am there, it's harder for me to take care of myself, because I'm so, just, in my own little bubble of nerves and anxiety – because he's very fickle. Anything can upset him. So, it's very on edge, all the time.

According to S.C., Mr. Couvillon told her her "feelings do not matter" and called her an "arrogant little s$%#" on more than one occasion. She also answered affirmatively when asked if Mr. Couvillon had told her that depression was not a real thing and that "you can choose to be happy." S.C. testified that if they got into a disagreement, it became "pretty heated" and could result in yelling and screaming. S.C. testified that she wanted a relationship with Mr. Couvillon and thought returning to Dr. Dupre would help with that.

In Ms. Couvillon's first assignment of error, she contends that the trial court erred in failing to designate a domiciliary parent as set forth in La. R.S. 9:335 where there was no implementation order to the contrary or any other good cause shown.

13

She argues that the trial court's ruling is not in S.C.'s best interest, specifically regarding S.C.'s mental health. Ms. Couvillon asks that this court designate a domiciliary parent or remand the matter to the trial court with instructions that a domiciliary parent be designated.

In this case, the parties were awarded joint legal and physical custody of the children in the December 4, 2020 consent judgment. In addition to its provisions regarding each party's physical custody, the consent judgment provided that the parties and children "shall adhere" to the joint custody implementation plan made a part of the judgment by reference.[7] The two-page joint custody implementation plan set forth holiday visitation and contained a provision that stated, in part, "The children shall abide by the terms of the visitation schedule and the children's stated wishes shall not be used as an excuse to change the terms of the Court Order or deny or limit visitation absent a previous written agreement between the parties."[8]

When joint custody is ordered, La. R.S. 9:335 governs the details of the custody arrangement, including physical custody, as well as the legal authority and responsibility of the parents, providing, in pertinent part:

> A. (1) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown.
>
> (2)(a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents.
>
> (b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.

---

[7] The consent judgment also provided that the parties "shall make sure" the children attended all extracurricular activities and counseling. It stated that the parties "shall find a family counselor" covered by Ms. Couvillon's insurance, which included Dr. Dupre, and if an acceptable family counselor was not found, Mr. Couvillon was to pay for the counselor.

[8] The joint custody implementation plan also contained general provisions, which included a prohibition against either parent posting negative remarks about the other on social media, a provision for each parent's phone access to the children, and a recommendation that the parents refrain from planning events during the other parent's custody time.

14

. . .

(3) The implementation order shall allocate the legal authority and responsibility of the parents.

B. (1) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.

(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.

(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.

C. If a domiciliary parent is not designated in the joint custody decree and an implementation order does not provide otherwise, joint custody confers upon the parents the same rights and responsibilities as are conferred on them by the provisions of Title VII of Book I of the Civil Code.

Louisiana Revised Statutes 9:336 also provides that "[j]oint custody obligates the parents to exchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority." Major decisions normally include decisions concerning major surgery or medical treatment, elective surgery, and schools attended, but not the day-to-day decisions involved in rearing a child, *e.g.,* bedtimes, curfews, household chores, and the like. See **Griffith v. Latiolais**, 2010-0754 (La. 10/19/10), 48 So.3d 1058, 1069; **Romadanova v. Chebanu**, 2018-0272 (La. App. 1 Cir. 1/8/19), 2019 WL 139389, *6 (unpublished opinion). Non-major decisions are not subject to judicial review. **Griffith**, 48 So.3d at 1069; **Romadanova**, 2019 WL 139389 at *6.

Thus, according to Subsection B of La. R.S. 9:335, the trial court shall designate a domiciliary parent in a decree of joint custody. However, La. R.S.

15

9:335(B)(1) provides for two circumstances in which a court may decline to name a domiciliary parent in a joint custody context, that is, when "there is an implementation order to the contrary" or "for other good cause shown." An "implementation order to the contrary" must meet the requirements of La. R.S. 9:335(A)(2) and (3) by specifically allocating physical custody times for each parent and allocating the legal authority and responsibility of the parents. See **Hodges v. Hodges**, 2015-0585 (La. 11/23/15), 181 So.3d 700, 710-12.[9]

We must now consider whether either of the exceptions set forth in La. R.S. 9:335(B)(1) exist in this case to justify the trial court's failure to designate a domiciliary parent, that is, whether the trial court issued "an implementation order to the contrary" or "for other good cause shown." In **Ehlinger**, 2017-1120 (La. App. 1 Cir. 5/29/18), 251 So.3d 418, 426, this court determined that where no domiciliary parent was designated, this court found that the joint custody implementation order was insufficient pursuant to La. R.S. 9:335(A). In **Ehlinger**, the joint custody implementation order specified the time periods during which each parent was to have physical custody and gave each parent, when exercising physical custody, the authority to administer medical care, including psychological treatment, as that parent deemed to be in the best interest of the child and provided steps for the resolution of any disputes regarding the same. However, the joint custody

---

[9] In **Hodges**, the supreme court reversed a judgment decreeing that the parties had joint custody of the child with equal physical custody on a week to week basis and were "co-domiciliary parents," among other terms, but did not allocate the legal authority and responsibility of the parents. 181 So.3d at 710-12. This court has considered the failure to designate a domiciliary parent in several cases. See **Romadanova**, 2019 WL 139389 at *6-8 (this court found good cause existed not to designate a domiciliary parent but remanded the matter to the trial court because the implementation order did not allocate the legal authority and responsibility of the parents); **Ehlinger**, 251 So.3d at 424-26 (this court remanded the matter to the trial court, which did not designate a domiciliary parent but the implementation order did not allocate the legal authority and responsibilities of the parents as to major decisions); **Wolfe v. Hanson**, 2006-1434 (La. App. 1 Cir. 5/2/08), 991 So.2d 13, 17-19, writ denied, 2008-1205 (La. 6/27/08), 983 So.2d 1292 (finding the trial court abused its discretion in failing to name a domiciliary parent where neither an implementation order nor good cause to the contrary existed).

16

implementation order did not allocate the legal authority and responsibility for other major decisions, such as school and/or preschool choices. **Ehlinger**, 251 So.3d at 426. In order for a joint custody implementation plan to be "an implementation order to the contrary" as an exception to the requirement for designating a domiciliary parent pursuant to La. R.S. 9:335(B), the implementation plan must meet the requirements of La. R.S. 9:335(A)(2) and (3). **Ehlinger**, 251 So.3d at 426. Similarly, in this case, the implementation plan does not allocate the legal authority and responsibility for major decisions regarding the health, education, and welfare of the minor child. Therefore, the first exception in La. R.S. 9:335(B)(1) of an "implementation order to the contrary" does not apply.

As to whether the second exception under La. R.S. 9:335(B)(1) applies, that is, whether good cause was shown as an exception to the requirement of designating a domiciliary parent, the record does not contain a determination by the trial court that good cause was shown for not naming a domiciliary parent. See **Romadanova**, 2019 WL 139389 at *6.[10]

Considering the above, we remand this matter to the trial court to determine if the exceptions set forth in La. R.S. 9:335(B) apply, that is, whether there is good cause shown not to designate a domiciliary parent or there is an implementation order to the contrary. Should the trial court choose to apply the implementation order exception, the current implementation order must be amended because it does not allocate the legal authority and responsibility for making major decisions as is

---

[10] In **Romadanova**, this court held that the trial court's thoroughly considered determination that the parties' lack of communication was temporary and was based largely on the choice of their child's first elementary school was sufficient to constitute good cause not to designate a domiciliary parent, where the trial court decided which school the child should attend and appointed a parenting coordinator. 2019 WL 139389 at *7. Because no domiciliary parent had been designated, this court remanded the matter for the trial court to enter an implementation order that validly allocated the legal authority and responsibility for major decisions by the parents pursuant to La. R.S. 9:335(A)(3). **Romadanova**, 2019 WL 139389 at *7-8.

required under La. R.S. 9:335(A)(2) and (3). See **Hodges**, 181 So.3d at 711-712; **Ehlinger**, 251 So.3d at 426.

In Ms. Couvillon's second assignment of error, she contends that the trial court abused its discretion by denying her request to modify physical custody in failing to consider the child's preference, the expert testimony of a psychologist, and that Mr. Couvillon had never actually exercised equal shared physical custody on a seven day rotating schedule due to his employment and military commitments. Where, as here, the underlying custody decree is a stipulated judgment, a party seeking a modification must prove that: (1) there has been a change in circumstances materially affecting the welfare of the child since the previous custody decree was entered; and (2) the proposed modification is in the best interest of the child. **Yepez v. Yepez**, 2021-0477 (La. App. 1 Cir. 12/22/21), 340 So.3d 36, 42. Therefore, as to Ms. Couvillon's request for a modification in the physical custody, she was required to show a material change in circumstances since the December 2020 consent judgment and that the proposed modification was in the children's best interest.

At the time the consent decree was signed in December of 2020, S.C. was fourteen years old, and at the time of the hearing on the motion to modify the custody arrangement, she was fifteen years old. Ms. Couvillon contends that S.C.'s mental health had deteriorated since the 2020 judgment, contending that she was undergoing counseling with Ms. Shelby for self-harm concerns, anxiety, panic attacks, and depression. She also argues that S.C. was being treated by Dr. Watkins, who had prescribed Adderall and Zoloft. Ms. Couvillon also relies on Dr. Dupre's testimony about the children having difficulty with the transition to equally-shared physical custody due to their parents' different parenting styles. Lastly, Ms. Couvillon contends that Mr. Couvillon's employment schedule warrants a change in custody.

18

We cannot say that the trial court abused its discretion in maintaining the custody schedule because Ms. Couvillon did not prove that there was a material change in circumstances. We have carefully reviewed the record in considering Ms. Couvillon's contentions, and S.C. was experiencing similar mental health issues in 2020 as those that were the basis of Ms. Couvillon's motion, yet the parties entered into a consent judgment wherein they agreed to gradually increasing visitation with Mr. Couvillon, culminating in equal physical custody between the parents. At the time the parties entered into the consent judgment, the children did not want to spend the night at Mr. Couvillon's house, which was also true at the time of the hearing on the modification of custody. Likewise, Mr. Couvillon's work schedule, while somewhat busier, had not materially changed since 2020. While the issues regarding S.C.'s mental health are concerning, the trial court required in its judgment that Mr. Couvillon and S.C. attend reunification therapy, and the consent judgment provided that the parties shall make sure the children attended counseling and the parties were to find a family counselor.[11] We note that the trial court is not bound by the testimony of an expert and such testimony is to be weighed the sae as any other evidence. **Babcock v. Martin**, 2019-0326 (La. App. 1 Cir. 10/24/19), 289 So.3d 606, 612. The weight to be given expert testimony is within the trial court's broad discretion. **Id**. Ms. Couvillon's second assignment of error has no merit.

In her third assignment of error, Ms. Couvillon contends that the trial court erred in finding her in contempt of court. In her fourth assignment of error, Ms. Couvillon contends that the trial court erred in awarding Mr. Couvillon twelve weeks

---

[11] If Mr. Couvillon does not successfully complete the court-ordered reunification therapy, or if the counselor agrees that reunification of S.C. with her father is not in her best interest, Ms. Couvillon may urge this as a change of circumstances that would warrant changing the custody schedule.

of makeup time of physical custody as a punishment for the alleged contempt of court.

Contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. La. C.C.P art. 221. A direct contempt is one committed in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons. La. C.C.P. art. 222. Any contempt other than a direct one constitutes a constructive contempt of court, including willful disobedience of any lawful judgment or order of the court. La. C.C.P. art. 224(2). A person may not be found guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law. La. C.C.P. art. 227.

According to La. C.C.P. art. 224(2), a person may be found in constructive contempt of court for willfully disobeying any "lawful judgment, order, mandate, writ, or process of the court." A finding that a person willfully disobeyed a court order in violation of La. C.C.P. art. 224(2) must be based on a finding that the person violated an order of the court intentionally, knowingly, and purposefully, without justifiable excuse. **Carollo v. Carollo**, 2013-0010 (La. App. 1 Cir. 5/31/13), 118 So.3d 53, 64. If the person charged with contempt is found guilty, La. C.C.P. art. 225(B) provides that the court shall render an order reciting the facts constituting the contempt, adjudging the person charged with contempt guilty thereof, and specifying the punishment imposed. See **Underwood v. Underwood**, 2021-0277 (La. App. 1 Cir. 10/21/21), 332 So.3d 128, 153-54.

The burden of proving that the accused violated the court order intentionally, knowingly, and purposely, without justifiable excuse, is on the moving party. See **Bents v. Bents**, 2015-1306 (La. App. 1 Cir. 9/9/16), 2016 WL 4719795, *3

(unpublished opinion), <u>writ denied</u>, 2016-1822 (La. 11/29/16), 211 So.3d 389. The burden of proof in a civil contempt case is by a preponderance of the evidence. **Bents**, 2016 WL 4719795 at *3; **Meek v. Meek**, 36,467 (La. App. 2 Cir. 9/18/02), 827 So.2d 1191, 1194. Proceedings for contempt must be strictly construed, and the policy of our law does not favor extending their scope. **Bents**, 2016 WL 4719795 at *3. The trial court is vested with great discretion in determining whether a party should be held in contempt for disobeying a court order, and the court's decision should be reversed only when the appellate court discerns an abuse of that discretion. **Boyd v. Boyd**, 2010-1369 (La. App. 1 Cir. 2/11/11), 57 So.3d 1169, 1178. However, the trial court's predicate factual determinations underlying the finding of civil contempt of court are reviewed under the manifest error standard of review. **Schmidt v. Schmidt**, 2018-0202 (La. App. 1 Cir. 1/3/19), 270 So.3d 804, 809.

In her third assignment of error, Ms. Couvillon initially contends that the trial court failed to recite the facts constituting contempt as required by La. C.C.P. art. 225(B), which states that if the person charged with contempt is found guilty, "the court shall render an order reciting the facts constituting the contempt." Ms. Couvillon cites **Havener v. Havener**, 29,785 (La. App. 2 Cir. 8/20/97), 700 So.2d 533, 538, wherein the Second Circuit vacated a judgment of contempt against the appellant father where the trial court found both parents in contempt for "a lack of communications" between them. The Second Circuit stated that the provisions of La. C.C.P. art. 225(B) are mandatory and must be strictly construed. **Havener**, 700 So.2d at 538. The failure of the trial court to recite facts constituting contempt mandated a reversal of a judgment of contempt. **Havener**, 700 So.2d at 538. In **Garrett v. Andrews**, 1999-1929 (La. App. 1 Cir. 9/22/00), 767 So.2d 941, 943, this court reversed the contempt judgment based on the trial court's finding that the appellant violated the court's December 20, 1994 judgment. This court found that

21

the trial court did not recite the facts upon which the contempt judgment was based as required by La. C.C.P. art. 225(B). **Id.** Even when the trial court fails to recite the facts constituting contempt in a written order, however, the jurisprudence has recognized that this requirement is satisfied if such facts are recited by the trial court in open court. **In re Succession of LeBouef**, 2013-0209 (La. App. 1 Cir. 9/9/14), 153 So.3d 527, 536; **Spring v. Edwards**, 2009-0902 (La. App. 1 Cir. 12/7/09), 2009 WL 5604433, *3 (unpublished opinion); **Babin v. McDaniel**, 2005-2455 (La. App. 1 Cir. 3/24/06), 934 So.2d 69, 73-74.

In this case, the trial court's judgment states, "**IT IS ORDERED, ADJUDGED AND DECREED** that [Mr. Couvillon's] motion to find [Ms. Couvillon] guilty of Contempt of Court for willfully disobeying a prior court order by denying [Mr. Couvillon's] custody of the minor children during his custodial periods is **GRANTED.**" This judgment does not contain a recitation of the facts of when and where Ms. Couvillon denied Mr. Couvillon custody that would constitute contempt as required by La. C.C.P. art. 225(B). The trial court also did not recite the facts constituting the contempt in open court. Without a recitation of the specific findings of fact constituting the contempt, the appellate court cannot review the trial court's ruling to determine if the trial court abused its discretion in finding Ms. Couvillon in contempt.

In this case, without specific findings of fact by the trial court, this court is left to determine the basis of the trial court's ruling with the allegations in the contempt motion as supported by the testimony and evidence at trial. In this case, Mr. Couvillon failed to meet his burden of proving that Ms. Couvillon was guilty of contempt. In his contempt motion, Mr. Couvillon specifically referred to two dates when he alleged Ms. Couvillon failed to allow or enforce his visitation, March 15, 2022, and March 26, 2022. We note that as to the March 15, 2022 incident that was

22

one basis of his contempt motion, Mr. Couvillon admitted that during an argument with S.C., he left the option of leaving his house and going to Ms. Couvillon's house up to the children, telling them, "y'all can do what y'all want." He was then asked if he told them, "I don't give a s&^&," to which he replied, "I may have said that." Mr. Couvillon admitted that Ms. Couvillon could not physically pick up the children and put them in the car and bring them to his home any more than he could do that if the situation was reversed. Ms. Couvillon testified that she tried to make the children go to Mr. Couvillon's home when they did not want to and that she disciplined them for not going to his house, stating:

> So, for the first two weeks, there was a – if you don't see your father, you can do nothing else. And they did nothing else. Then, he communicated to them, that he had no desire to meet and resolve it; that he would see them in Court – at which point, every week, I sent them to [their high school], which is where the exchange happens, with the full understanding that they were to go with their father; and every week, they came back.

Mr. Couvillon admitted that Ms. Couvillon and S.C. asked him repeatedly to get together to work their issues out, but he refused because he felt it would have been "fruitless." As to the March 26, 2022 allegation, Mr. Couvillon did not put forth specific evidence that Ms. Couvillon violated the consent judgment and joint custody implementation plan intentionally, knowingly, and purposely without justifiable excuse. While she admitted that she texted him that the children were refusing to visit him, this text was preceded by other texts asking Mr. Couvillon to meet with her and the children to resolve the matter. As can be seen in this case, in order to review whether the trial court abused its discretion in finding a party in contempt of court, the trial court must set forth its factual findings. Accordingly, Ms. Couvillon's

23

third assignment of error has merit and we reverse the trial court's finding that she was in contempt of court.[12]

In her fourth assignment of error, Ms. Couvillon contends that the trial court abused its discretion in awarding Mr. Couvillon twelve weeks of makeup visitation time as a punishment for the contempt of court where the evidence showed that Mr. Couvillon had never exercised a full seven-day period due to other commitments. We pretermit consideration of the fourth assignment of error because the relief sought has become moot with our reversal of the trial court's finding that Ms. Couvillon was in contempt of court.

## CONCLUSION

We affirm that part of the August 15, 2022 judgment denying the reconventional demand of Wendy Marie Martinez Couvillon seeking to modify the December 4, 2020 consent judgment. We reverse that part of the judgment denying the request to designate Wendy Marie Martinez Couvillon as a domiciliary parent and remand to the trial court to determine if there is good cause for not naming a domiciliary parent or to amend the joint custody implementation order in order to allocate the parents' legal authority and major-decision making ability in accordance with La. R.S. 9:335 and this opinion. The request of Wendy Marie Martinez Couvillon to be designated domiciliary parent is remanded to the trial court in the event that the trial court is unable to enter a valid joint custody implementation order or find good cause for not doing so in accordance with La. R.S. 9:335. We reverse that part of the judgment finding Wendy Marie Martinez Couvillon in contempt of

---

[12] The object and purpose of a contempt proceeding in a custody matter is not to punish the child. Rather, the object and purpose of a contempt proceeding is to vindicate the authority and dignity of the court. **Smith v. Smith**, 35,378 (La. App. 2 Cir. 9/26/01), 796 So.2d 726, 730. It is not designed for the benefit of the litigants, even though the infliction of punishment for contempt may inure to the benefit of the mover in the contempt rule. **Smith**, 796 So.2d at 730.

# STATE OF LOUISIANA
# COURT OF APPEAL
# FIRST CIRCUIT

## 2023 CU 0056

### WENDY MARIE MARTINEZ COUVILLON

### VERSUS

### MICHAEL ANDRE COUVILLON



**GREENE, J., agreeing in part and concurring in part.**

I agree with the majority's affirmance of the trial court's judgment denying Ms. Couvillon's reconventional demand. I also agree with the majority's reversal of the judgment denying Ms. Couvillon's request to be designated domiciliary parent and the remand directing the trial court to promptly modify the joint custody implementation plan consistent with La. R.S. 9:335 and the majority opinion. Further, I agree with the reversal of the contempt judgment against Ms. Couvillon, because the trial court failed to issue an order reciting the facts constituting Ms. Couvillon's contemptuous behavior, or state such facts in open court, as is required by La. C.C.P. art. 225(B). However, I disagree with the majority's analysis of whether Mr. Couvillon's allegations of contempt are supported by the record. Because reversal of the contempt judgment does not require this analysis, I think it is unnecessary.



WENDY MARIE MARTINEZ COUVILLON

VERSUS

MICHAEL ANDRE COUVILLON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**McClendon, J., agrees in part and dissents in part.**

I agree with the majority that the trial court abused its discretion in holding Ms. Couvillon in contempt of court. I disagree, however, with the majority's conclusion that the trial court did not err in denying Ms. Couvillon a custody modification and denying her request to be named domiciliary parent. The evidence presented in this case clearly demonstrates a change in circumstances materially affecting the welfare of the minor child, S.C., and that modification of custody is in the best interest of the minor child, S.C.

As noted by the majority, Mr. Couvillon admitted that although S.C. had issues with anxiety and depression before the consent judgment was signed, she was not diagnosed with self-harm and panic attacks, nor was she prescribed Zoloft and Adderall until after the signing of the consent judgment. The majority additionally noted that Dr. Dupre, who counseled the family, had concerns about how "mentally safe" S.C. felt with her father. Dr. Dupre also testified that S.C. had to be taken off the Adderall due to "suicidal ideations." The record further establishes Mr. Couvillon told S.C. that her feelings didn't matter and called her an "arrogant little s&%#" on more than one occasion. S.C. herself testified that she felt she regressed emotionally when at her father's house due to the environment of anxiety.

Considering the entirety of the evidence presented, I find that it is in the best interest of the minor child, S.C., to designate Ms. Couvillon as domiciliary parent with Mr. Couvillon having physical custody every other weekend and with the appropriate shared

holiday schedule. Accordingly, I respectfully agree in part and dissent in part from the

majority opinion.